UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
GREENEVILLE

| | | |
|---|---|---|
| REBECCA LOIS HILL | ) | |
| | ) | |
| V. | ) | NO. 2:12-CV-105 |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security | ) | |

## REPORT AND RECOMMENDATION

This matter is before the United States Magistrate Judge, under the standing orders of the Court and 28 U.S.C. § 636 for a report and recommendation. This is an action for judicial review of the Commissioner's final decision denying the plaintiff's application for supplemental security income following an administrative hearing before an Administrative Law Judge ["ALJ"]. Both the plaintiff and the Commissioner have filed Motions for Summary Judgment [Docs. 10 and 14].

The sole function of this Court in making this review is to determine whether the findings of the Commissioner are supported by substantial evidence in the record. *McCormick v. Secretary of Health and Human Services,* 861 F.2d 998, 1001 (6th Cir. 1988). "Substantial evidence" is defined as evidence that a reasonable mind might accept as adequate to support the challenged conclusion. *Richardson v. Perales*, 402 U.S. 389 (1971). It must be enough to justify, if the trial were to a jury, a refusal to direct a verdict when the conclusion sought to be drawn is one of fact for the jury. *Consolo v. Federal Maritime Commission*, 383 U.S. 607 (1966). The Court may not try the case *de novo* nor resolve conflicts in the evidence, nor decide questions of credibility. *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). Even if the reviewing court were to resolve the factual issues

differently, the Commissioner's decision must stand if supported by substantial evidence. *Liestenbee v. Secretary of Health and Human Services,* 846 F.2d 345, 349 (6th Cir. 1988). Yet, even if supported by substantial evidence, "a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right." *Bowen v. Comm'r of Soc. Sec.,* 478 F.3d 742, 746 (6th Cir. 2007).

Plaintiff was 48 years of age with a high school education. No one disputes that she can no longer perform her past relevant work. Her disability onset date is March 20, 2009. A great deal of the evidence in the file comes from before that date, apparently submitted in conjunction with an earlier unsuccessful application.

Plaintiff's medical history is summarized in the plaintiff's brief as follows:

> The Plaintiff has been primarily treated through Holston Medical Group. Dr. Sherif Yacoub-Wasef, Holston Medical Group, examined the Plaintiff on March 11, 2009 due to her fibromyalgia / high prolactin level and elevated LFT's. This doctor's initial physical examination was normal. However, he wanted to investigate other causes of the fatigue. The assessment was hyperprolactinemia and fatigue (Tr. 254 - 255).
> The Plaintiff was examined by Dr. Manoj Srinath, through Holston Medical Group, on March 20, 2009, due to fatigue, exhaustion, generalized malaise, depression, anxiety, occasional nausea, unintentional weight loss of 18 pounds in the last year, chronic constipation since childhood, palpitations, and forgetfulness. The claimant had recently been found to have positive hepatitis C antibody. The assessment was hepatitis C. Dr. Srinath offered to refer her to a psychiatrist for further management of her psychiatric symptoms prior to treatment of hepatitis C (Tr. 258 – 259).
> The Plaintiff again was examined by Dr. Manoj Srinath on March 30, 2009. The doctor noted the lack of presence of hepatitis C RNA. The assessment was positive hepatitis C antibody could be secondary to previous exposure to virus and multiple somatic complaints of unclear etiology. Dr. Srinath referred the Plaintiff back to her primary care physician for further evaluation. The Plaintiff wished to set up a primary care doctor through Holston Medical Group because of not getting along with her current primary physician. (Tr. 268 - 269).
> Dr. Polly Billips examined the Plaintiff on April 1, 2009. The doctor's physical exam revealed abdominal, upper back, bilateral arm and bilateral thigh muscle tenderness. Dr. Billips observed Plaintiff intermittently rubbing arms, legs, rocking due to widespread pain, but speech was clear, at times, comfortable appearing and noted mood to be

2

dysthymic and mildly anxious. The assessment was shortness of breath, abdominal pain, insomnia, abnormal weight loss, myalgia, myositis and fatigue (Tr. 270 - 274).

Plaintiff was evaluated by Dr. Kevin Kirk on April 6, 2009 in order to be established as a new patient. Dr. Kirk noted Plaintiff to be extremely agitated, nearly hysterical with an apparent panic attack. This doctor noted a April 1, 2009 chest x-ray which revealed an anterior mediastinal mass (Tr. 275). Dr. Kirk's assessment was insomnia, abnormal weight loss, generalized anxiety disorder, panic disorder without agoraphobia and mediastinal masses. The doctor discontinued her trazodone and started Plaintiff on Effexor 75 mg twice daily and increased her Xanax to 1 mg twice daily. Dr. Kirk suspected fibromyalgia and referred Plaintiff to rheumatologist for confirmation and possible further evaluation. The doctor noted he would see Plaintiff back in two weeks with a strong recommendation at that time that she establish with a psychiatrist to assess affective issues as well as long-standing insomnia (Tr. 277 - 279).

Dr. Kevin Kirk again examined the plaintiff on April 23, 2009. The doctor noted she was much more coherent and appropriate at this meeting. Dr. Kirk noted the findings of a fine needle aspiration of chest mass along with the pathologist recommending complete excise of the mass. The assessment was generalized anxiety disorder, panic disorder without agoraphobia and mediastinal masses. Dr. Kirk noted attempting to arrange a follow-up for Plaintiff with Dr. Myers concerning the masses (Tr. 294 - 295).

Dr. Andrew L. Folpe, from the Mayo Clinic, reviewed Plaintiff's medical information on June 1, 2009. Dr. Folpe agreed with the prior opinion of excision of the mass and recommended baseline imaging of the lungs and essentially indefinite long term follow-up (Tr. 351).

Plaintiff reported to Holston Valley Medical Center on May 21, 2009 for excision of the mass. Plaintiff was released on May 24, 2009 following this procedure. On May 29, 2009 Plaintiff returned to this location due to being anxious and shaky for which she was given Ativan 1 mg (Tr. 352 - 372).

On June 23, 2009 Plaintiff was seen by Dr. Kirk. The doctor noted she had recovered well from the surgery, but complained of tightness in her chest with deep breathing. The assessment was shortness of breath, generalized anxiety, and mediastinal masses (Tr. 376 - 378).

Dr. Sherif Yacoub-Wasef followed up again with Plaintiff on July 1, 2009. The doctor's assessment was hyperprolactinemia, simple goiter, fibromyalgia and fatigue. The doctor noted that she was still having fatigue and body pain, with tender points. The physical exam indicated Plaintiff was tearful, angry, skeptical, and negative (Tr. 373 – 375).

Plaintiff underwent a psychological consultative examination by Dr. Steven Lawhon on July 7, 2009. Plaintiff reported having back pain, arthritis, headaches, anxiety and depression. Dr. Lawhon noted her affect and mood as being anxious and depressed. The doctor gave a diagnosis of generalized anxiety disorder and depression due to medical reasons and assigned a current Global Assessment of Functioning score of 58. Dr. Lawhon opined that Plaintiff would be moderately limited in her ability to sustain concentration and persistence and mildly to moderately limited her work adaptation (Tr. 400 - 403).

Dr. Samuel Breeding examined Plaintiff on July 16, 2009 for a physical consultative examination at the request of Tennessee Disability Determination Services. Dr. Breeding

noted Plaintiff to have some diffuse tenderness on palpation of her trapezius muscles and deep tendon reflexes as 2+/4. The doctor opined to limitations including lifting no more than 35 pounds occasionally, having difficulty doing sustained physical activity, sitting for only four to six hours in an eight-hour day and standing four to six hours in an eight-hour day. The doctor concludes his report by referencing Plaintiff's report of her panic attacks worsening and her feeling very nervous all the time (Tr. 404 - 406).

On August 28, 2009, a reviewing state agency doctor opined Plaintiff would have a moderate degree of limitation in restriction of activities of daily living, difficulties maintaining social functioning, and difficulties in maintaining concentration, persistence, or pace (Tr. 407 - 420). In a separate report, dated the same day and completed by the same doctor as the previous report, the Plaintiff was noted as having twelve areas of moderate limitations and the doctor concluded this report by noting Plaintiff can adapt to gradual, infrequent changes and set short term goals (Tr. 430 - 433).

On January 12, 2010, another reviewing state agency doctor again opined to Plaintiff having eleven separate areas of moderate limitations (Tr. 644 - 645). This doctor concluded the report by noting Plaintiff was able to interact with small group, 1:1 and occasional or superficial, not continual general public interaction, can get along with supervisors and coworkers; no major problems anticipated and is able to adapt to routine, not frequent or fast-paced change (Tr. 646). The same doctor, on the same day, completed another report and noted moderate limitations in maintaining social functioning and maintaining concentration, persistence or pace (Tr. 664).

On January 12, 2010, a reviewing state agency physician opined Plaintiff could lift and/or carry twenty pounds occasionally, ten pounds frequently; can stand/walk for a total of about six hours in an eight-hour workday; can sit for a total of about six hours in an eight-hour workday; can occasionally climb ramps, stairs, ladders, ropes, scaffolds; can occasionally balance, stoop, kneel, crouch, and crawl (Tr. 649 - 650). This state agency physician additionally notes "Cl's allegations are consistent, representative of the MDIs and proportional to the objective findings and are therefore credible" (Tr. 652).

Dr. Ken Smith, Blue Ridge Neuroscience Center, P.C., initially examined Plaintiff on February 27, 2008 because of cervical pain, bilateral shoulder pain, right upper extremity pain and headaches. Plaintiff indicated to Dr. Smith that she had been dealing with cervical pain for approximately three years and she had not been able to maintain gainful employment but did want to return to employment and routine activities. Upon musculoskeletal examination, Dr. Smith noted moderate cervical paraspinous muscle contractions bilaterally and an indention at the top of the left upper extremity deltoid muscle without associated tenderness. The doctor examined Plaintiff's range of motion and found extension was limited to 10 degrees, left rotation was limited to 40 degrees and right rotation limited to 45 degrees. A diagnosis of neck pain and spasm of muscle, bilateral trapezial was rendered. Dr. Smith's impression and treatment options were that no surgical interventions were appropriate and the presenting symptoms were consistent with myofacial pain and best treated conservatively utilizing physical therapy and topical agents, including heat/ice application, massage, electrical stimulation, routine cervical stretching program and possible trigger point injections. It was additionally noted by the doctor, and discussed with Plaintiff, she may continue to have some degree of pain, weakness, or numbness regardless of treatment option selected. Plaintiff was scheduled for physical therapy for evaluation and treatment for cervical spasm and TENS unit for

home use if indicated. Dr. Smith concluded this evaluation by noting Plaintiff may continue her employment and activities as a cook from a neurosurgical standpoint (Tr. 668 - 671).

Plaintiff returned to Dr. Ken Smith on April 8, May 23, July 22, and October 31, 2008 for a follow-up of her cervical pain, bilateral shoulder pain, right upper extremity pain and headaches. The doctor continually noted moderate cervical paraspinous muscle contractions bilaterally and areas of reduced range of motion. Plaintiff was administered trigger point injections at each of these visits (Tr. 672 - 683).

On February 17, 2009 Plaintiff was examined by Dr. Marion Owen, Whole Family Medicine, for aches in shoulders and neck along with migraines. The diagnosis was given of myalgia, migraine, fatigue, and prob fibromyalgia (Tr. 702 - 704). Plaintiff followed up with this doctor on August 6, 2009 for muscular pain and difficulty sleeping. Plaintiff reported feeling very anxious, worse upper back and shoulders, increasing wrist, ankles difficulty and finger stiffness in the morning. A diagnosis of adrenal hypofunction, myalgia and chronic insomnia was given (Tr. 695 - 696).

Plaintiff attended physical therapy session with Essential Therapy Services from January 7, 2010 until February 1, 2010 for widespread chronic extreme pain in her muscles and joints along with migraines (Tr. 722). Plaintiff initially rated the migraine pain as being seven to eight, when they occur, on a ten point scale (Tr. 722).

Plaintiff was evaluated and treated at Arthritis Associates of Kingsport from October 14, 2009 through April 12, 2010 for fatigue and "pain all over" (Tr. 748). A diagnosis of fibromyalgia, insomnia, neck/shoulder pain, anxiety and arthralgia was given (Tr. 739). On April 12, 2010, Laraine R. Bowen PA-C, noted limited knee extension bilaterally and multiple FM tender points. Ms. Bowen reviewed possible medication treatment but cited to lyrica not being effective, neurontin and savella not being tolerated by Plaintiff (Tr. 738).

Dr. Kevin Kirk, Holston Medical Group, followed up with Plaintiff on October 26, 2009 and April 26, 2010 for continued complaints of diffuse myalgias, fibromyalgia and significant anxiety issues. The assessment was fibromyalgia and generalized anxiety (Tr. 873 - 874, 886 - 888).

On August 9, 2010 Plaintiff was evaluated by Dr. John L. Wilson, Great Smokies Medical Center for Muscle and joint pain, stiffness, headaches, flu-like achy symptoms and exhaustion (Tr. 895). Dr. Wilson completes a review of systems which includes being often hot, lack of appetite, trouble falling and staying asleep, excessive thirst, very tired during the daytime, nighttime person, awakens unrefreshed as if she had not slept, poor memory, difficulty concentrating, fatigue, exhaustion, headaches, feels faint, unexplained weight loss with decreased appetite, decreased stamina, unable to work, sick all the time and under chronic stress (Tr. 894). The doctor's assessment was malaise/fatigue, mercury toxicity, fibromyalgia, yeast enteritis, polypharmacy, hypothyroidism, cold extremities, difficulty initiating and maintaining sleep, constipation, nocturia, cephalgia, impaired memory, natural menopause and uterine fibroids (Tr. 892). Dr. Wilson opted to initiate and perform further testing.

[Doc. 11, pgs. 2-8].

At the administrative hearing, the ALJ took the testimony of a vocational expert

["VE"]. After determining the demands of the plaintiff's past relevant work, and her lack of transferrable skills, the ALJ asked the VE to assume a person of plaintiff's age, educational level and work experience. The VE was then asked to "assume this person could do light work, occasional postural, simple, routine, repetitive, better than things with people." When asked if there were jobs that person could perform, the VE identified 1.4 to 1.5 million jobs in the national economy and 30 to 35 thousand in the State of Tennessee. When asked the same question, but with the person having a sit/stand option, the VE identified 900,000 to 1 million jobs in the national economy and 25,000 in the State of Tennessee. When asked the same question without the sit/stand option but limited to sedentary jobs, the VE identified 80 to 85 thousand jobs in the nation and 22 to 23 hundred jobs in the State. (Tr. 41-43).

In his hearing decision, at Step Two of the sequential process, the ALJ determined that the plaintiff had severe impairments of a back and neck disorder; fibromyalgia; a history of positive hepatitis C antibody; a history of removal a chest wall mass with no recurrence; depression; and anxiety. (Tr. 13). The ALJ then discussed the medical evidence. He noted conservative treatment from 2003 through 2007 for her neck and back problems. He discussed the fact that Dr. Ward of Pain Medicine Associates saw the plaintiff for evaluation of her neck, shoulder and migraines on September 7, 2007, diagnosing cervical myofascial pain, cervical degenerative disc disease, anxiety and sleep disturbance. He noted that Dr. Ward opined that the plaintiff "exhibited exaggerated pain behaviors." He prescribed medications and referred her for a psychophysiological assessment to assess myfascial components. (Tr. 13). He then spent the next three pages of his opinion discussing the various findings of treating sources, consultative examiners Breeding and Lawhon, and the

6

State Agency physicians and psychologists. (Tr. 14-17).

The ALJ found that the plaintiff's mental impairments caused mild restrictions in activities of daily living, moderate difficulties in social functioning, and moderate difficulties in concentration, persistence and pace, with no episodes of decompensation. He discussed the plaintiff's activities of daily living, "such as driving, washing dishes, sweeping, vacuuming, doing the laundry, watching television, going for a walk, and performing household chores," which he found was consistent with his findings regarding the degree of limitation caused by the plaintiff's mental symptoms. He then found that the plaintiff had the residual functional capacity ["RFC"] "to perform simple, routine, repetitive work at the light level of exertion that allows a sit/stand option and which requires dealing with things rather than people. (Tr. 18).

He then proceeded to discuss the various medical opinions, noting whether they were consistent with his RFC finding and the weight he gave the opinions of the various sources. He gave Dr. Breeding's "opinion no weight as it is too restrictive based on his own findings and the overall evidence of record." He gave great weight to Dr. Lawhon's second mental assessment, which came after the alleged onset date. He generally gave great weight to the opinions of the State Agency physicians and psychologists, but noted that the opinion of opinion of psychologist Dr. Karen Lawrence that the plaintiff had a moderate restriction in her activities of daily living (Tr. 417) was "not consistent with the claimant's reported activities of daily living." (Tr. 19-20).

The ALJ then discussed his finding regarding the plaintiff's subjective complaints. He stated that her allegations of pain and other limiting symptoms which she said precluded any

7

substantial gainful activity "were not completely credible." He stated "the medical evidence fails to reveal findings to support pain to the degree alleged." He pointed out that "Dr. Breeding noted that the claimant had normal range of motion, normal strength, and normal gait." He stated that "no treating physician has placed any restrictions on the claimant nor indicated that she was totally disabled at any time..." He again mentioned Dr. Ward's report that the plaintiff exhibited exaggerated pain behaviors. He noted that plaintiff had done well following surgery for removal of the chest mass. He stated again that "the claimant's reported activities of daily living...are not indicative of debilitating or disabling pain or other symptoms." For all of these reasons he found that the plaintiff's was not entirely credible in describing the limiting effects of her pain and conditions. (Tr. 20-21).

Although the plaintiff could not return to any past relevant job, with her age, education, work experience and RFC, there were a significant number of jobs which she could perform. Accordingly, he found that she was not disabled. (Tr. 21-22).

Plaintiff asserts that the ALJ did not consider medical opinions which indicated additional work related limitations besides those included in the ALJ's RFC finding and his question to the VE at the hearing. Particularly, the plaintiff asserts that the ALJ did not include various moderate mental impairments contained in the assessments of the state agency psychologists. She also argues that he erred in not finding the plaintiff fully credible regarding her subjective complaints, and disregarded medical evidence indicating that she was. Also, plaintiff states that the ALJ did not properly explain the weight given to Dr. Breeding's assessment. Finally, she complains that the ALJ did not adequately consider the adverse effects of certain impairments, particularly fibromyalgia, and did not find other

8

document impairments, such as chronic fatigue syndrome, to be severe.

The Court would initially note that all of the medical assessments which contain opinions regarding the plaintiff's physical and mental limitations come from non-treating sources. No treating source has opined on the extent of any such limitations, or even that there are limitations. All of the opinion evidence is from consultative or state agency sources. The very fact that there are no opinions regarding limitations from treating sources, in and of itself, has been held to be substantial evidence supporting an ALJ's finding that a claimant was not disabled. *See, Longworth v. Comm'r of Social Security*, 402F3d 591, 596 (6th Cir. 2005). This is an even more compelling argument in a case such as this one, where the medical record alone covers nearly 700 pages.

Dr. Breeding was a consultative examiner. The ALJ went to great lengths to explain in his hearing decision what weight he gave to Dr. Breeding, and why he gave his highly restrictive opinion on RFC no weight. Dr. Breeding's examination findings did not substantiate the severe restrictions he placed on the plaintiff. Also, as a consultative examiner, the ALJ is not under the same duty to explain the weight given to Dr. Breeding's opinion as is required in the case of a treating source, although in this case the explanation was more than adequate.

As for the mental limitations which the ALJ allegedly did not include in his RFC and question to the VE, these are contained in the residual functional capacity forms of the state agency psychiatrists (Tr. 430-433, 655-647). The various restrictions which the plaintiff says the ALJ "left out" of his RFC are contained in "Section I," the "summary conclusions" section, of the respective forms. The actual functional capacity assessment is contained in

Section III of the forms (Tr. 433 and 647). *See*, Program Operations Manual System ["POMS"], 2001 WL 1933367. The actual opinions of the state agency psychologists regarding the residual functional capacity of the plaintiff are compatible with the ALJ's RFC finding.

The plaintiff's credibility is a key issue in this case, as it is in most all cases involving complaints of pain not supported by an observable objective source, such as atrophied muscles or impinged nerve roots. Here, the ALJ opined that the plaintiff's physical impairments could case some pain, but not the "all day all over" pain which the plaintiff described in her testimony. The ALJ referred to various sources to support his finding that the plaintiff was not so limited by pain that she could not do a reduced range of light work. Dr. Breeding noted a normal gate/station, a normal range of motion of major joints, and full muscle strength in all major muscle groups. These are not indicative of a person having disabling pain. The plaintiff had undergone conservative treatment for her musculoskeletal conditions, and as said early, no treating physician ever imposed limitations or opined that she was disabled. She never was treated on an inpatient basis for mental impairments, and the RFC limited her to dealing with objects rather than people. The most compelling evidence of all upon which the ALJ based his opinion on credibility was the notation by treating physician Dr. Sameh A. Ward, who stated that the plaintiff "does exhibit exaggerated pain behaviors." (Tr. 210). The Court would have deferred to the ALJ's finding on credibility for the other reasons contained in his decision, but this opinion from a treating physician for someone claiming to be disabled based so heavily upon her subjective complaints is most compelling. A treating doctor does not easily put a statement such as this in a person's medical record. The ALJ's finding that

the plaintiff is not totally credible in describing the extent of her limitations is well explained and well supported by the evidence.

Finally, the plaintiff asserts that the ALJ did not properly consider the limiting effects of her various conditions, most especially fibromyalgia, which the ALJ found was a severe impairment. Some of the conditions which he did not find to be severe, such as chronic fatigue syndrome, would cause no different adverse effects on plaintiff's functional capacity than conditions the ALJ did find, such as problems with her back and neck for which he limited her to light work with a sit/stand option. The Court does not understand how this could be error. As for fibromyalgia, while this painful condition is a real disease which is nonetheless difficult to show by objective means, and is a condition which can disable an individual, it is not *automatic* for a diagnosis to equate to being disabled. *See, Higgs v. Bowen,* 880 F.2d 860, 863 (6th Cir. 1988), and *Torres v. Comm'r of Soc. Sec.*, 2012 WL 3089334, at pg. 5 (6th Cir. 2012). Medical observations such as normal gait and muscle mass are some gauge of the severity of the pain, and the finding of the ALJ on credibility certainly factors in as well. The ALJ thoroughly discussed and the plaintiff's documented conditions and subjective complaints, and made a finding in this regard for which there is substantial supportive evidence. He fulfilled his role as finder of fact and his finding was supported and reasonable.

There was substantial evidence to support the ALJ's RFC findings and his question to the VE. There are a substantial number of jobs this plaintiff can perform. It is therefore respectfully recommended that the plaintiff's Motion for Summary Judgment [Doc. 10] be DENIED, and the defendant Commissioner's Motion for Summary Judgment [Doc. 14] be

GRANTED.[1]

                      Respectfully submitted,

                                             s/ Dennis H. Inman
                                            United States Magistrate Judge

---

[1] Any objections to this report and recommendation must be filed within fourteen (l4) days of its service or further appeal will be waived. 28 U.S.C. 636(b)(1).